## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JANE DOE,

                Plaintiff,                :     Case No. 3:14-cv-00046

     - vs -

                                           Magistrate Judge Michael R. Merz

SPRINGFIELD-CLARK CAREER
  TECHNOLOGY CENTER, et al.
                                  :

                Defendants.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

The matter before the Court is Defendants' Springfield Clark Career Technology Center Board of Education and Brad Moffitt's Motion for Summary Judgment under Fed. R. Civ. P. 56. (ECF No. 69.) Plaintiff filed a Memorandum in Opposition to the Motion for Summary Judgment (ECF No. 71) and Defendants filed a Reply (ECF No. 73).

Because this case was referred on unanimous consent of the parties, the Motion is before the Magistrate Judge for decision (Order of Transfer on Consent, ECF No. 13).

### APPLICABLE STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-250 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992), *quoting Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986). Therefore a

court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted); see also *Alexander v. Caresource,* 576 F.3d 551 (6th Cir. 2009), *citing Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F.2d 606 (6th Cir. 1992).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular

issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A factual issue is "material" if its resolution would affect the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir. 2001). "Materiality is determined by the substantive law claim." *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000). An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Niemi v. NHK Spring Co., Ltd.,* 543 F.3d 294, 298  (6th Cir. 2008);  *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), *quoting Liberty Lobby ,* 477 U.S. at 248. Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002).  Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported.  *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union, United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific

facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby ,* 477 U.S. at 252.  If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper.  *Celotex Corp.,* 477 U.S. at 322-23. "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Alexander v. CareSource,* 576 F.3d 551 (6th  Cir. 2009), *quoting Everson v. Leis,* 556 F.3d 484, 496 (6th  Cir. 2009) (*citing Skousen v. Brighton High School*, 305 F.3d 520, 528 (6th  Cir. 2002)).

The party who bears the burden of proof must present a jury question as to each element of the claim.  *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes.  *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir. 1991).

The Court may grant summary judgment on the issue of causation when warranted. *Bailey v. Floyd County Bd. or Education.,* 106 F.3d 135, 145 (6th Cir. 1997).  For example, reliance solely on the fact that an adverse employment decision occurred after the alleged protected conduct is insufficient.  *Id.* at 144-45.  "A mere scintilla of evidence is [likewise] insufficient" to create a genuine issue of material fact.  *Landham v. Lewis Galoob Toys, Inc.,* 227 F.3d 619, 622 (6th Cir. 2000).

The facts set forth in this Decision  are admitted or established by evidence competent under Fed. R. Civ. P. 56(e) and not controverted by opposing competent evidence.

**Facts of the Case**

Defendant Jeffrey Scott Rohrer was employed by Defendant Springfield-Clark Career Technology Center Board of Education ("CTC") beginning in 2010 as the junior culinary arts instructor at Springfield-Clark Career Technology Center, a vocational high school in Clark County, Ohio. (Complaint, ECF No. 1, PageID 2-3, ¶¶ 2, 4, 8.)

During the 2010-2011 school year, several students complained to the CTC administration about Rohrer's inappropriate conduct with students, which included both allegations of inappropriate comments and touching.  (Complaint, ECF No. 1, PageID 3, ¶ 9); (Response, ECF No. 71, PageID 4678, 4680.)   Administrators Schakat, Jennings, and Smith, in conjunction with superintendent, Defendant Brad Moffitt, initiated an internal investigation into the allegations. (Complaint, ECF No. 1, PageID 3, ¶ 9); (Response, ECF No. 71, PageID 4682.) Upon completion of the investigation, Moffitt determined the allegations to be "vague, exaggerated, or untrue." (Complaint, ECF No. 1, PageID 3, ¶ 10.)  Regardless, it was determined that Rohrer could improve on his professionalism in the classroom.  A growth plan was put into place with the addition of increased supervision. (Complaint, ECF No. 1, PageID 3, ¶ 15.)

Jane Doe was a junior in the culinary arts program, under the supervision of Defendant Rohrer, during the 2011-2012 school year. (Complaint, ECF No. 1, PageID 4, ¶ 17.) During her junior year she was considered a "favorite" student and was named as a member of the culinary competition team, which was under the guidance of Chefs Hay and Rohrer. *Id*. at ¶¶ 18-20. While Doe states that there was no inappropriate touching at this time, she does allege that a set of grooming behaviors began to emerge. (Complaint, ECF No. 1, PageID 4, ¶ 20.) Specifically she asserts that 1) Rohrer favored her over other students, 2) she was allowed to come in early and help (make coffee, do laundry) and often ate her lunch in the lab instead of going to the cafeteria, 3) he pried into her personal life and would sometimes go through her phone,  4) he

talked about sex on a daily basis, though Doe never reported this to any teacher or administrator, and 5) he had her stay after school for competition team practice when no one else was around.

During her senior year, Rohrer's actions became more aggressive. In November 2012, the culinary students attended the Fabulous Food Show in Cleveland, Ohio. (Response, Doc. No. 71, PageID 4689.) Once students had been sent to their rooms for the night, Rohrer sent Doe a text message requesting that she come to his room. *Id.* She told her roommates that she had a competition team meeting and left her room, spending the next few hours alone with Rohrer in his room. Chef Hay discovered that Plaintiff was not in her room. Rohrer covered for her by telling Hay that Doe had texting him saying that she had a disagreement with her roommates and needed time alone and asked if she could go to the hotel gym and work out. Hay questioned the story and appeared to be angry with both Rohrer and Plaintiff for breaking the rules. *Id.* at PageID 4689-4690.

Once they returned home, Rohrer continued his flirtation with Plaintiff, eventually culminating in Rohrer's leaving a note on Plaintiff's phone asking her if she wanted to be "friends with benefits." *Id.* at PageID 4690. Rohrer took advantage of the afterschool competition practices to arrange time alone with Doe and to engage in sexual activity. This occurred on several occasions.[1] Plaintiff argues that the sexual abuse occurred while "Plaintiff was under the control of Rohrer, in the areas of school to which Rohrer had access by virtue of his employment." (Complaint, ECF No. 1, PageID 5, ¶ 29.)

On the evening of April 22, 2013, a janitor saw Rohrer and Plaintiff leave a bathroom one right after the other. (Response, ECF No. 71, PageID 4690.) After confirming via video

---

[1] Despite the assertion in the Complaint that this included "approximately half a dozen instances of sexual intercourse on school grounds[.]" other pleadings, including the Response, state that it occurred 3 to 4 times. (Complaint, ECF No. 1, PageID 4, ¶ 24); (Response, ECF No. 71, PageID 4690); (Rohrer Depo., ECF No. 60-5, PageID 1992).

surveillance footage that Rohrer and Doe had been in the bathroom together, Schakat, Jennings, and Smith drove to the culinary arts competition in Columbus, Ohio, for the purpose of speaking with Doe and Rohrer. *Id*. at 4691. Doe was taken aside and  admitted to the administrators that she had been sexually battered by Rohrer.  Rohrer was then confronted by Smith and told that he had been accused of inappropriate behavior with a student. (Rohrer Depo., ECF No. 60-5, PageID 1996.)  They were driven back to CTC separately. Once they arrived, Rohrer was placed on suspension pending investigation and told to leave campus. (Rohrer Depo., ECF No. 60-5, PageID 1997.) Doe was met by her mother and a police officer for a further interview and to obtain clothing items for a DNA sample. (Response, ECF No. 71, PageID 4691); (B.D. Depo., ECF. No. 58, PageID 1452); (King Depo., ECF No. 60-4, PageID 1864, 1872, 1876-1877); (Doe Depo., ECF No. 62, PageID 2293-2296.)

Later in the investigation, police had  Doe place a taped phone call to Rohrer during which she (falsely) stated she was pregnant. Rohrer's response served as an admission to the sexual relationship between himself and his student. (King Depo., ECF No. 60-4, PageID 1890); (Doe Depo., ECF No. 62, PageID 2299-2300.) Rohrer turned himself into police on May 28, 2013. He was charged with sexual battery and jailed. (King Depo., ECF No. 60-4, PageID 1892.) Rohrer pled guilty to two counts of sexual battery and is currently in prison.

Plaintiff brought this action  on February 12, 2014.  In her Complaint she raises six causes of actions. The underlying theme for each cause of action relates to, what she terms as, Defendants' improper handling of the complaints raised against Rohrer during the 2010-2011 school year. (Complaint, ECF No. 1.) These complaints should have given Defendants notice as to Defendant Rohrer's propensity for  behavior of a sexual nature against his students, yet they failed to take the appropriate corrective actions. *Id*. Defendants CTC and Moffitt allegedly

> (a) permitted Rohrer to have unsupervised access to various rooms and areas of the school; (b) permitted Rohrer to have unsupervised contact with students after hours; (c) did not report the acts of Rohrer to law enforcement that constituted sexual harassment, sexual grooming, and sexual abuse; (d) did not competently investigate the complaints of students about Rohrer's conduct; (e) did not warn and/or disclose to the students, including Plaintiff, the concerns about Rohrer; (f) failed to comply with the duties set forth in district policies and procedures and Ohio law and federal law; (g) concealed Rohrer's sexual harassment, sexual grooming and sexual abuse of students prior to Plaintiff's abuse; (h) were deliberately indifferent to the safety, security and well-being of students at CTC, including but not limited to Plaintiff; (h) [sic] prevented students, including Plaintiff, from receiving an education without a condition of such education being sexual harassment, sexual grooming and sexual abuse; and (i) promoted school policies that fostered a climate to flourish where innocent students, including Plaintiff, were victims of sexual abuse.

(Complaint, ECF No. 1, PageID 5-6, ¶ 31.)  Plaintiff argues that the above failures resulted in a violation of her rights and safety.

# ANALYSIS

## First Cause of Action- Title IX, 20 U.S.C. 1681 et seq

In her First Cause of Action, Jane Doe pleads  a violation of Title IX, 20 U.S.C. 1681, *et seq.* (Complaint, ECF No. 1, PageID 6.) Specifically she argues that Title IX requires educational opportunity on an equal basis to all students regardless of their gender. She, however, was subjected to discrimination in that she suffered teacher-on-student sexual harassment, sexual grooming, and sexual abuse as a condition of her receipt of an education. Further she argues that CTC possessed actual notice of Rohrer's behaviors, yet failed to take appropriate corrective action once they had notice, thus acting with deliberate indifference to the

rights and safety of Plaintiff. As such, CTC is alleged to be liable under Title IX.

Defendants argue that Doe cannot hold the school district liable under Title IX, as she is unable to prove either required element, that a district official with authority to implement corrective measures had actual notice of abuse and that that official exhibited deliberate indifference to the misconduct.  (Motion for Summary Judgment, ECF No. 69, PageID 4644.) They argue that the student complaints raised against Rohrer in 2011 did not involve similar conduct and were insufficient notice of a likelihood that Rohrer would have a sexual relationship with Doe two years later. *Id*. at PageID 4646. Complaints such as storing a deer head in the school refrigerator, favoritism among students, not selecting a student's food during a classroom competition, and inappropriate statements and jokes did not provide notice of a risk of sexual abuse. *Id*. Additional complaints, such as physical contact with students, were found to have been unfounded or part of "kitchen culture" as a safety precaution. Additionally, the complaining students were found to be incredible. Therefore, nothing in these allegations would have provided CTC with notice of either past abuse or a substantial likelihood of future abuse. *Id*. at PageID 4647, 4649.

Defendants continue by asserting that in light of the circumstances known to them at the time of their investigation, their actions were not the result of "deliberate indifference." *Id*. at PageID 4650. In looking at the proportionality of the school's response in light of the available information, CTC did not turn a blind eye to the initial allegations, but rather launched an internal investigation, interviewed students in the culinary arts program, interviewed Rohrer and his fellow culinary instructor, Chef Hay, and in an effort to determine the validity of one of the claims that Rohrer had been in the storage room with a female intern, reviewed the security recording of the hallway with the entrance to the storage room. *Id*. at 4650-4652. Based on the

information gathered from the investigation, it was determined that the claims were unsubstantiated. It was noted however, that Rohrer lacked certain boundaries and professionalism. As a result Rohrer was verbally reprimanded, a "professional growth plan" was implemented, and the administration monitored Rohrer in the classroom and labs. *Id*. at 4652-4653. Given this information, a reasonable factfinder could not conclude, even viewing the evidence in a light most favorable to Doe, that CTC showed deliberate indifference to the 2011 allegations against Rohrer. *Id*. at 4653.

Plaintiff counters Defendants claim that they did not have actual notice that Rohrer posed a risk to students because the complaints of B.F., C.S., and T.R. did not involve allegations that were sexual in nature. Rather, she asserts that "the prior complaints against Rohrer were explicit and discernible forms of sexual harassment which involved both verbal and sexual contact." (Response, ECF. No. 71, PageID 4702.) B.F., C.S., T.R., and their mothers complained to the administration regarding Rohrer's "sexually suggestive comments, a proposition for a relationship outside of the classroom, sexual advances, and sexual contact. . . ." (Response, ECF No. 4700.) This gave CTC and the superintendent actual notice of Rohrer's behaviors and that these behaviors amounted to sexual grooming as Rohrer was "developing a culture and climate of talking about sex, of making sexual jokes . . . being very physically friendly and . . . dealing with students at the peer student level rather than as an adult . . ." *Id*., quoting ECF No. 66 at 67. Further, Doe argues, Defendants failed in that they had a policy in which teachers are required to report harassment. Yet despite knowing of the original allegations in 2011, Chef Hay failed to report them when he found Plaintiff out of her room at the Cleveland field trip and was admittedly suspicious of Rohrer's story. Knowing of the previous complaints of inappropriate behavior and observing Rohrer's behavior with Plaintiff are alleged to serve as actual

knowledge. *Id*. at PageID 4701.

Doe further contends that Defendants demonstrated deliberate indifference to the original complaints. *Id*. at PageID 4702-4703. Several of the complaints were sexual in nature. *Id*. Yet not every student was interviewed, some of the facts from the interviews were disregarded, and the school chose to blame the three complaining students, as opposed to placing the blame on the teacher and remedying the situation. *Id*. at PageID 4703. Defendants again chose to ignore indications of inappropriate behavior when Plaintiff was discovered missing from her hotel room in Cleveland. Despite Rohrer's suspicious cover story and a noticeable increase in his flirtation with Plaintiff, Defendants did nothing. *Id*.

When Congress enacted Title IX of the Civil Rights Act of 1972, it did so with two objectives in mind, 1) to avoid the use of federal resources to support discriminatory practices, and 2) to provide individuals with protection against those practices. *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 509 (6th Cir. 2001), *citing Cannon v. University of Chicago*, 441 U.S. 677, 704 (1979). Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a); *Klemencic*, 263 F.3d at 509. The duty not to discriminate on the basis of sex encompasses a teacher's sexual abuse of a student. *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir 2005); *McCoy v. Board of Education*, 515 Fed. App'x 387, 391 (6th Cir. 2013); *Klemencic*, 263 F.3d at 509-510. A school district may be held liable under Title IX when its employee sexually harasses a student. *Klemencic*, 263 F.3d at 510, *citing Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 74-75 (1992) and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). The Supreme Court, however, has rejected vicarious liability and constructive notice for

purposes of Title IX. *Gebser*, 524 U.S. at 287-288; *Klemencic*, 263 F.3d at 509-510; *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999). To hold a school district and its officials liable under Title IX the Plaintiff must show 1) that he/she was subjected to sexual harassment 2) that he/she provided actual notice of the situation to a school district/official with authority to take corrective action, and 3) the institution's response exhibited deliberate indifference to the harassment. *Klemencic*, 263 F.3d at 510; *McCoy*, 515 Fed. App'x at 391.

To establish this first *prima facie* prong against an institution under Title IX, Plaintiff must show she was subjected to sexual harassment. In viewing the evidence in a light most favorable to the non-moving party, this Court finds that Plaintiff has provided sufficient evidence from which a jury could find  that she was sexually battered by Defendant Rohrer when he, as her teacher, engaged in a sexual relationship with her.

This cause of action hinges then on whether or not the Defendants had actual notice, based on their internal investigation of Rohrer's behavior and his likelihood to assault a student, and in turn whether their actions amounted to deliberate indifference.

> Deliberate indifference can be found only in cases where officials of a recipient entity with authority to take corrective action, having been advised of a Title IX violation, decide not to remedy the violation. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998)[parallel citations omitted]. Put differently, deliberate indifference arises when "school officials are aware of the misconduct but do nothing to stop it, despite [the school district's] ability to exercise control over the situation." *Horner v. Ky. High Sch. Athletic Assn.*, 206 F.3d 685, 692 (6th Cir. 2000). The recipient entity's response to the harassment must be clearly unreasonable in light of the known circumstances to be actionable under Title IX. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo harassment or 'make them liable or vulnerable' to it." *Id*. at 644.

*McCoy*, 515 Fed. App'x at 391-392.

Failure to take any disciplinary action despite reports of repeated sexual harassment will rise to the level of deliberate indifference. The case is less obvious however in situations where some action was taken to remedy to complaints. In that instance the "proportionality of the school's response in light of available information" will form the basis of the indifference analysis-thus the propriety of the district's response is measured by what circumstances were known in connection with their response. See *McCoy*, 515 Fed. App'x at 392.

As the facts pertaining to notice and the appropriateness of the actions taken by CTC are intertwined, the Court will address those two prongs collectively.

Defendant Rohrer was employed by Springfield-Clark Career Technology Center beginning in 2010 as the junior culinary arts instructor.

During Rohrer's first year of teaching, three of the senior year students, B.F.,[2] C.S., and T.R., complained to the administration about Rohrer making inappropriate comments and exhibiting inappropriate behaviors around the students. Specifically, all parties agree, that the students alleged: that Rohrer joked around unprofessionally with his students, which included making inappropriate names or comments about mayonnaise and an ongoing joke about one of his students having one testicle; that he placed his hands on female students' shoulders; that Rohrer laughed with his students after they made inappropriate statements and let it carry on as opposed to putting an end to their behavior; that he pried into his some of his students' personal business; that he got in front of C.S.'s face and punched his fist into his hand while saying "boo ya ya" and; that Rohrer had an emotional attachment to student B.W. (See March 9, 2011 Accusations and Investigation, Moffitt Depo., ECF. No. 60-2, PageID 1775.) In addition C.S. alleged that she witnessed Rohrer in a storage room with college intern Brooke Bishop Brennan

---

[2] Now known as B.O., but for consistency as she is referred to as B.F. in the pleadings, depositions, and affidavits, the Court will address her as such.

and that she suspected that the two had been engaged in inappropriate behavior. (C.S. Depo., ECF No. 39, PageID 425-426.)

B.F., C.S., and T.R., as well as B.F.'s mother, C.G., and C.S.'s mother, L.H., claim that they raised additional allegations to the administration. These additional claims include: that Rohrer offered to make B.F. a cake in exchange for her showing him around town ((C.G. Depo., ECF No. 37, PageID 234, 250); (B.F. Depo., ECF No. 60-1, PageID 1566)(might have mentioned it, but doesn't remember)); Rohrer improperly referred to teachers or parents entering the student-run restaurant, the Jaguar Room, as "hot" (C.G. Depo., EFC No. 37, PageID 251); that Rohrer provided a handout on how to break up with your significant other (C.G. Depo., EFC No. 37, PageID 235, 251-252); that Rohrer rubbed his hands down B.F.'s as well as other female students' backs and put his hands on their waists ((C.G. Depo., ECF No. 37, PageID 234, 235, 250, 251); (C.S. Depo., ECF No. 39, PageID 387-388); (B.F. Depo., ECF No. 60-1, PageID 1565); (L.H. Aff., ECF No. 72, PageID 5006, ¶ 6)(in the meeting with Schakat alerted her to Rohrer's improper sexual advances on B.F.)); that Rohrer stood behind B.F. and reached around her, and/or Rohrer pressed his front side against the back of B.F. and wrapped his arms around her as he assisted her in performing kitchen tasks ((C.G. Depo., ECF No. 37, PageID 234, 250); (T.R. Depo., ECF No. 60-6, PageID 2144, 2147-2148)); that he removed B.F.'s glasses and wiped batter from her face (C.G. Depo., ECF No. 37, PageID 235, 252); and that Rohrer encouraged his students to discuss their sex lives ((C.G. Depo., ECF No. 37, PageID 235, 252); *but see* (C.S. Depo., ECF No. 39, PageID 433)(does not remember whether or not she told the administration about Rohrer's participation in these discussions); (B.F. Depo., ECF No. 60-1, PageID 1582)(does not think she told administration about these conversations)).

Defendants respond by saying they were not made aware of these additional specific

instances of alleged misconduct.[3] *See* (Reynolds Depo., ECF No. 38, PageID 342) (did not hear about encouraging students to talk about their sex lives); (Schakat Depo., ECF. No. 41, PageID 490) (not told that Rohrer would encourage discussion among his students of their personal sexual experiences or that he had handed out a "how to end relationships" handout); (Smith Depo., ECF No. 43, PageID 670) (did not personally hear complaints that Rohrer would encourage students to talk about their sexual experiences but remembers that it was one of the allegations investigated); (Moffitt Depo., ECF No. 60-2, PageID 1727) (not aware of an allegation that Rohrer had been encouraging students to discuss their sexual relationships, if he had been made aware this would have been considered inappropriate and given a reprimand); (Reynolds Depo., ECF No. 38, PageID 343) (did not hear about the handout on how to end relationships); (Moffitt Depo., ECF No. 60-2, PageID 1727) (was not aware of the allegation of the how to end relationship handout); (Smith Depo., ECF No. 43, PageID 671) (was not aware of the allegation that Rohrer passed out a handout on how to end relationships); (Schakat Depo., ECF. No. 41, PageID 491) (was not told that Rohrer offered to bake a cake for B.F. if she would show him around town); (Smith Depo., ECF No. 43, PageID 671) (not made aware of the allegation that Rohrer offered to bake a cake for B.F. if she would show him around town); (Moffitt Depo., ECF No. 60-2, PageID 1727) (was not told of the conversation where Rohrer allegedly offered to bake a cake for B.F. if she would show him around town); (Schakat Depo., ECF. No. 41, PageID 491) (was not made aware of the complaint that Rohrer would refer to customers in the restaurant as "hot"); (Reynolds Depo., ECF No. 38, PageID 343) (did not hear allegation that Rohrer had been referring to the customers as "hot"); (Smith Depo., ECF No. 43, PageID 672)(was not made aware of the complaint that Rohrer would refer to customers in the

---

[3] In her deposition, Schakat described additional allegations such as Rohrer saying, "I only need to tell my dog to do something once," smacking a flagpole, telling students, "yeah, I'll get right on it" and then walking away, and "I have nothing to say to you. You're lazy and worthless in the kitchen." (Schakat Depo., ECF No. 41, PageID 527.)

Jaguar Room as "hot"); (Smith Depo., ECF No. 43, PageID 669) (did not hear allegations that Rohrer would put his hands on female students' hips); *Id.* at 675 (if had heard about incident where Rohrer came up behind B.F. and reached around her to help her stir, that would have raised a red flag as inappropriate touching of a student); (Schakat Depo., ECF. No. 41, PageID 491) (there was no mention of an allegation that Rohrer would touch female students' hips, only that he would touch their shoulders or backs); (Reynolds Depo., ECF No. 38, PageID 344) (was not told that Rohrer would touch female students hips).[4]  The Court notes however that the letter summarizing the findings of the internal investigation and sent to parents of the accusers states, "7. There were other accusations, but I found the ludicrous nature of those allegations did not merit putting to paper." (Moffitt Depo., ECF. No. 60-2, PageID 1775.) The letter does not give

---

[4] Defendants further address these additional claims as being without substance, as supported by depositions and affidavits of former students.

- Rohrer offered to make B.F. a cake in exchange for her showing him around town (J.C. Depo., ECF No. 64-3, PageID 2788) (did not hear Rohrer offer to bake a cake for B.F. if she would show him around town); (T.R. Depo., ECF No. 60-6, PageID 2154) (Did not hear Rohrer offer to bake a cake for B.F. in exchange for her showing him around town)

- Rohrer made comments on people's appearances, referring to teachers or parents entering the Jaguar Room as "hot" (K.N. Depo., ECF 64-2, PageID 2717 (does not recall Rohrer making comments about people's appearances); *Id.* at 2727 (does not recall Rohrer referring to customers at the Jaguar Room as "hot"); (J.C. Depo., ECF No. 64-3, PageID at 2776 (Never heard Rohrer comment on the "hotness" of customers at the Jaguar Room)

- Rohrer provided a handout on how to break up with your significant other (K.N. Depo., ECF 64-2, PageID at 2727) (not aware of a handout advising how to end a relationships); (J.C. Depo., ECF No. 64-3, PageID at 2779) (Rohrer did not pass out a handout about how to end relationships)

- Rohrer encouraged students to talk about their sexual relationships. (Z.S. Depo., ECF No. 64-1, PageID 2670)(not aware that Rohrer would discuss things sexual in nature in presence of students) (K.N. Depo., ECF 64-2, PageID at 2717) (seniors would sit around and discuss sex, but does not recall Rohrer joining in those conversations); (J.C. Depo., ECF No. 64-3, PageID 2750, 2774-2777, 2781) (felt Rohrer did occasionally make inappropriate comments about celebrities or insert himself into the students' conversation and told administration of this during interview. Also stated however that the comments were related to comments on appearance and not inappropriate such as discussion on sexual topics); (B.V. Aff., ECF No. 52-3, ¶ 5) (never heard Rohrer say anything of a sexual nature. If students were having inappropriate discussions he either made them stop or ignored them, never heard Rohrer encourage the students or participate in such conversations)

any indication as to the nature of those allegations, other than characterizing them as "ludicrous."

After the allegations were brought to the administration's attention, CTC launched an internal investigation. At the very least this investigation included a conference among administrators as to how to proceed, meetings with the complaining students and their respective mothers on several occasions, interviewing several of the culinary arts students, and reviewing video footage showing the door to a storage room to substantiate or refute C.S.'s allegation that Rohrer had engaged in inappropriate behavior with an intern in the supply room. (Schakat Depo., ECF. No. 41, PageID 488) (met with the student(s) lodging complaints and/or a parent); (Smith Depo., ECF. No. 43, PageID 666) (met with C.S. and her mother regarding the allegations against Rohrer); (L.H. Aff., ECF No. 72, PageID 5005, ¶ 3) (mother of C.S., heard daughter and B.F. complaining about Rohrer touching female students and talking in a crude and sexual manner around students); *Id.* at ¶ 6; (had a meeting with Schakat, Smith, and Rohrer regarding concerns about Rohrer); (B.F. Depo., ECF. No. 60-1, PageID 1566-1570) (had numerous meetings with Schakat, Jennings, and Smith); (B.F. Depo., ECF. No. 60-1, PageID 1610) (meetings with Smith); (T.R. Depo., ECF No. 60-6, PageID 2139-2143, 2146) (brought his concerns about Rohrer to the administration, spoke with Schakat and Jennings); (Schakat Depo., ECF. No. 41, PageID 494-495) (allegations were taken to Moffitt and they all conferred as a team as to how to investigate the allegations); (Moffitt Depo., ECF No. 60-2, PageID 1684) (left investigation in the hands of Schakat, Smith, and Jennings); (Rohrer Depo., ECF No. 60-5, PageID 1954) (investigation initiated against him as a result of allegations made by students); (Schakat Depo., ECF. No. 41, PageID 497) (interviewed students); (Jennings Depo., ECF. No. 42, PageID 599-600) (interview of students); (Smith Depo., ECF. No. 43, PageID 663, 665, 676) (supported Schakat in her role of investigating the allegations and the student interviews); (B.F.

Depo., ECF. No. 60-1, PageID 1570-1571) (interviews with the culinary students); (Moffitt Depo., ECF No. 60-2, PageID 1685) (interview of culinary students and Chefs Rohrer and Hay); (Schakat Depo., ECF. No. 41, PageID 500) (interviewed teachers Rohrer and Hay); (Rohrer Depo., ECF No. 60-5, PageID 2025) (remembers at least one meeting with Schakat and Smith); (Z.S. Depo., EFC No. 64-1, PageID 2679-2680) (was interviewed about Rohrer's behavior by Schakat); (B.M. Aff., ECF No. 52-1, ¶ 8)(was interviewed by Smith regarding Rohrer); (A.M.. Aff., ECF No. 52-1, ¶ 8)(was interviewed by administration at CTC).

The student interviews were conducted by faculty member Amy Schakat with other faculty members present throughout. Schakat stated that there was not a particular method followed for the interviews; rather that she would speak with the students separately and she would begin by asking broad questions and narrow the scope as the interview went on. She recorded the students' answers on a blank piece of paper. (Schakat Depo., ECF. 41, PageID 495-497.) Students were then given the opportunity to look over the paper to make sure she did not misunderstand anything and then they signed the paper. (Schakat Depo., ECF. 41, PageID 495-497.)

The interviews did not corroborate B.F., C.S., and T.R's version of events. (Schakat Depo., EFC No. 41, PageID 499); (Smith Depo., ECF No. 43, 680-681); (Moffitt Depo., ECF No. 60-2, PageID 1691-1692). To the contrary, depositions and affidavits from the former culinary arts students show that the students did not report seeing Rohrer do anything inappropriate and though there occasionally may have been an inappropriate remark, it was nothing that was "over the line."

- Rohrer joked around unprofessionally with his students, which included making inappropriate names or comments about mayonnaise and an ongoing joke about one of his students having one testicle. (K.N. Depo., ECF 64-2, PageID at 2713) (does not remember Rohrer joining in the joking about one testicle); *Id*. at 2726 (not aware of

the mayo comment); (J.C. Depo., ECF No. 64-3, PageID. at 2788) (Did not hear Rohrer joke about one testicle); (B.M. Aff., ECF No. 52, ¶ 9) (did not hear Rohrer make the mayonnaise reference)

- Rohrer inappropriately touched females students, by placing his hands on female students' shoulders; also alleged touching of their hips, running his hands down their backs, touching B.F.'s face, and pressing his front against B.F.'s back. (Z.S. Depo., ECF No. 64-1, PageID 2670) (never saw Rohrer touch a student in an inappropriate manner or heard complaints of Rohrer doing such thing); (Z.S. Depo., ECF No. 64-1 2684) (never observed Rohrer doing anything inappropriate); (K.N. Depo, ECF 64-2, PageID 2708) (never saw or heard any inappropriate behavior by Rohrer); (J.C. Depo., ECF No. 64-3, PageID at 2752) (did not see inappropriate touching nor hear Rohrer make a sexual proposition or advance on a student); (J.C. Depo., ECF No. 64-3 PageID 2760) (was interviewed as to whether she had ever seen inappropriate conduct on the part of Rohrer, to which she responded in the negative); (J.C. Depo., ECF No. 64-3 PageID 2765) (never saw Rohrer touch a student in a way that could be considered sexual); (B.M. Aff., ECF No. 52, ¶ 8) (was interviewed by the administration and reported that she had never heard nor seen Rohrer do anything inappropriate or anything that made her uncomfortable); *Id.* at ¶ 11 (never saw Rohrer touch any student in an inappropriate way); (A.M.. Aff., ECF No. 52-1, ¶ 4-5) (Never saw Rohrer touch a student in an inappropriate way nor heard him say anything sexual in nature); (A.J. Aff., ECF No. 52-2, ¶¶ 7-9)(never saw Rohrer touch a student inappropriately); (B.V. Aff., ECF No. 52-3, ¶ 4) (never saw Rohrer touch a student in an inappropriate way); (T.R. Depo, ECF No. 60-6, PageID 2135) (aside from the "stirring the pot" incident, did not witness any inappropriate touching); *Id.* at PageID 2151 (Did not see Rohrer touch B.F.'s face or remove her glasses)

- Rohrer would laugh with his students after they made inappropriate statements and let it carry on as opposed to putting an end to their behavior, he would participate in their conversations. (Z.S. Depo., ECF No. 64-1, PageID 2676) (does not think Rohrer participated in the students' talks about their sexual experiences); (K.N. Depo., ECF 64-2, PageID 2717) (students would sit around and discuss sex, does not remember Rohrer joining in those conversations); (J.C. Depo., ECF No. 64-3, PageID 2750, 2774-2777, 2781) (felt Rohrer did occasionally make inappropriate comments about celebrities or insert himself into conversation and told administration of this during the investigation interview but Rohrer's comments did not cross the line and were not sexual); (A.J. Aff., ECF No. 52, ¶ 10) (never heard Rohrer say anything that was sexually inappropriate); (B.V. Aff., ECF No. 52-3, ¶ 5) (never heard Rohrer say anything of a sexual nature. If students were having inappropriate discussions he either made them stop or ignored them, never heard Rohrer encourage the students or participate in such conversations)

- Rohrer had an emotional attachment to student B.W. (B.M.[5] Aff., ECF No. 52, ¶ 7);[6] (Rumors that she was involved with Rohrer, this was false); (Schakat Depo., ECF.

---

[5] Formerly known as B.W.

No. 41, PageID 510-511) (B.W. denied an emotional attachment with Rohrer); (Hay Depo., ECF No. 60-3, PageID 1806) (Rohrer's interaction with B.W. was nothing more than student/teacher); (Rohrer Depo., ECF No. 60-5, PageID 2006) (denied that he had a relationship with B.W.)

In addition to the student interviews, the administration also spoke with Chef Hay and Chef Rohrer. (Schakat Depo., ECF No. 41, PageID 497, 500-501.) Rohrer denied all allegations with the exception of touching students' backs. He stated that this touch was a safety precaution to avoid accidents when moving in busy kitchen. (Rohrer Depo., ECF No. 60-5, PageID 1947-1950, 1955-1959, 2006.) Hay also denied observing any inappropriate conduct. (Schakat Depo., ECF No. 41, PageID 501).

Study hall monitor, Lois Reynolds, was also interviewed during this process and supported B.F., in that Reynolds reported that B.F. made comments during study hall as to Rohrer wiping something off of her face and on a second occasion removing her glasses. (Reynolds Depo., ECF No. 38, PageID 332, 338.) She did not get the impression that B.F. was bothered by the first event, but may have been by the second, so Reynolds suggested that B.F. discuss the event with her mother or a school counselor. *Id*. at PageID 336, 341. [7] Reynolds was reprimanded by the administration for her involvement in this situation as she was a study hall aide and her job was to keep the students on task and she was not a "school counselor" licensed

---

[6] On a side note, the Court cautions counsel from crossing the line between zealous advocacy for their clients and distorting the facts and/or implying facts not in evidence, such as counsel's reply to B.M's denial of a relationship between herself and Rohrer, "Bainbridge also greatly relies on the denial of B.W. that she had an improper relationship with Rohrer. (*Id*. at 32). Yet it is not unusual for a victim of child sexual abuse to deny her abuse until much later in life. That is the reason R.C. 2305.111 (C) was enacted in 2006 to extend the civil statute of limitations from one year past majority to twelve years past majority. B.W. is now in the Marines, escaping to a new life, and admission of her past is certainly not something she would want to deal with at this point." (Response, ECF No. 71, PageID 4697.)

[7] Again, the Court cautions counsel about arguing facts not in evidence. "Reynolds is still clearly intimidated and controlled by CTC administration. During her deposition, Smith was present within her view and she looked at him at least half a dozen times before answering questions." (Response, ECF No. 71, PageID 4685.)

to give advice.

Finally, members of the administration reviewed the surveillance footage taken of the hallway which showed the door to the culinary arts storage room. (Schakat Depo., ECF No. 41, PageID 542); (Jennings Depo., ECF No. 42, PageID 618); (Moffitt Depo., ECF No. 60-2, PageID 1711). This review was to corroborate or contradict C.S.'s allegation that she saw Rohrer and college intern Bishop enter together. C.S. stated that she had followed them into the room and saw Rohrer move "real fast" as if perhaps Rohrer and Bishop had been engaged in something intimate and he was hurrying away from her upon interruption. The footage did not substantiate that Rohrer and the intern had been together in the storage room for any period of time longer than a minute. (Jennings Depo., ECF No. 42, PageID 618); (Moffitt Depo., ECF No. 60-2, PageID 1774.) In her affidavit, Brooke Bishop Brennan also denied the allegation that she and Rohrer acted inappropriately in the supply room. She said nothing of that nature ever occurred and that their relationship was strictly professional. (Brennan Aff., ECF 50-2, PageID 939, ¶ 12.)[8]

After the initial interviews and fact gathering, the administration met with Superintendent Moffitt to discuss the investigation. Moffitt reviewed all the materials and spoke further with Chef Hay. (Moffitt Depo., ECF 60-2, PageID 1690.) At the conclusion of the investigation CTC determined that the allegations of inappropriate behavior were not credible. Rohrer was however given a verbal reprimand and instructed to establish stronger professional boundaries. (Moffitt Depo, ECF No. 60-2, PageID 1698-1699); (Rohrer Depo., ECF No. 60-5, PageID 1962, 1964-

---

[8] As previously stated, the Court takes exception to Plaintiff's characterization of Bishop's testimony without further evidence to support their proposition that, "Defendants have now, long after the fact, presented an affidavit from the intern, Brooke Bishop (now known as Brennan), who denies having had any relationship with Rohrer. It is not surprising that Bishop, who is now married, would today deny a relationship with a convicted felon who was married at the time." (Response, ECF No. 71, PageID 4685.)

1966, 2015-2016). Defendants assert that the administration created a professional development plan for Rohrer to follow.  Further, administration conducted both formal and informal observations of Rohrer's classes to verify that the atmosphere had changed. In addition to classroom observation, Schakat accompanied the culinary arts students on a field trip to Hocking College for a competition. (Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 19.) This increased observation continued through the 2011-2012 school year. In addition to the time spent observing the classroom ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 14); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶¶ 3-5)),   administrators  engaged students in conversation to see how their year was going ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 15); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 6)), spoke with Chef Hay and Chef Rohrer on several occasions ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 16); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 7)), spoke with the guidance counselor to see if there had been any new complaints (Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 17), and frequently ate in the school restaurant to further keep an eye on things ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 18); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 8)). At no time during this year were any concerns raised ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 21); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 10)).

The issue before the Court in determining the Motion for Summary Judgment on the Title IX claim is not whether the former students now claim to have seen that behavior, but rather what information CTC had before it at the time of the initial 2011 investigation and how that information colored their investigation and corrective remedies with Rohrer's teacher/student interactions at that time. This is the crux in the proportionality balancing test to determine whether the school acted appropriately or with deliberate indifference.  In looking at the evidence in a light most favorable to the nonmoving party, there is a genuine issue of

material fact as to what additional information was or was not conveyed to CTC administrators, how that information impacted the course of the internal investigation, and whether their investigative and remedial actions were in proportion to the information they had before them at the time.

Plaintiff further argues that the CTC had actual notice as to her own abuse as a result of the Cleveland field trip. (Response, ECF No. 71, PageID 4701.) Chef Hay was aware that Doe left her hotel room and confronted Rohrer to find out if she had been with him. *Id.* This combined with observing Rohrer and Doe in the classroom, as well as knowledge of the past allegations against Rohrer, provided Hay, and therefore CTC, with actual notice. *Id.*

To hold a school district and its officials liable under Title IX the Plaintiff must show that he/she provided actual notice of the situation to a school district or an *official with authority* to take corrective action. *Klemencic*, 263 F.3d at 510; *McCoy*, 515 Fed. App'x at 391. Hay was not an official as mandated under Title IX. Even if he did have a duty to report any abuse, both Rohrer and Doe used the same cover story when speaking with Hay, denying any involvement in Cleveland. (Hay Depo., ECF No. 60-3, PageID 1830-1831); (Rohrer Depo., ECF No. 60-5, PageID 1983-1988); (Doe Depo., ECF No. 62, PageID 2275-2278, 2281.) They likewise stated that once their relationship developed, they hid it from everyone. (Rohrer Depo., ECF No. 60-5, PageID 1995, 2002); (Doe Depo., ECF No. 62, PageID 2285, 2288.)

It is clear that once the abuse situation came to light, CTC acted immediately. Administrators from CTC drove to the culinary competition in Columbus to question Doe on the allegations. (Jennings Depo., ECF. No. 42, PageID 614-615); (Doe Depo., ECF No. 62, PageID 2290). Doe was taken aside and she told the administrators what had happened with Rohrer. (Jennings Depo., ECF. No. 42, PageID 616-617); (Doe Depo., ECF No. 62, PageID 2290-2291.)

Rohrer was then confronted by Smith and told he had been accused of inappropriate behavior with a student. (Rohrer Depo., ECF No. 60-5, PageID 1996.) They were driven back to CTC separately. Once they arrived, Rohrer was placed on suspension pending investigation and told to leave campus. (Rohrer Depo., ECF No. 60-5, PageID 1997). Doe was met by her mother and a police officer. (B.D. Depo., ECF. No. 58, PageID 1452); (King Depo., ECF No. 60-4, PageID 1864, 1872, 1876-1877); (Doe Depo., ECF No. 62, PageID 2293-2296) (rode back to Springfield with Schakat. When she arrived at CTC, her mother was there, later police). CTC cooperated with police in the investigation of this matter. (King Depo., ECF No. 60-4, PageID 1876-1877) (met with Schakat as the administration had some documentation regarding their interactions with those involved. Schakat mentioned previous allegations against this teacher); (King Depo., ECF No. 60-4, PageID 1881) (met with CTC administrators Schakat and Smith and obtained victim statements); (King Depo., ECF No. 60-4, PageID 1889) (spoke with B.W. as her name came up from the previous allegations as someone Rohrer may have had an attachment to, thought she could corroborate Doe's story, B.W. stated that nothing had happened between herself and Rohrer).

The Court further notes that the credibility of the complaining students in the 2011 incidents is at issue. The initial investigation by CTC found that the students were not credible and Defendants have submitted an abundance of evidence to support this conclusion in the form of depositions and affidavits from students and teachers.[9] These credibility issues go to the heart

---

[9] The students speak of a drama filled year led by B.F., C.S., and T.R. Their drama not only centered around fellow students, but their known dislike of Rohrer and desire to see him fired. (K.N. Depo., ECF 64-2, PageID at 2709, 2711) (B.F., C.S., and T.R. were rude, spiteful. B.F. often lied to get attention); *Id*. at PageID 2718 (B.F., C.S., and T.R. caused 90% of the drama that went on in the culinary department, they were instigators); *Id*. at PageID 2709, 2711 (B.F. and C.S. did not like Rohrer); (J.C. Depo., ECF No. 64-3, PageID 2757) (C.S. was a troublemaker and would "run her mouth" and pick on the junior girls); *Id*. at PageID 2758) (B.F., C.S., and T.R. were always creating drama and conflict); *Id*. at PageID 2754-2755 (the seniors [B.F., C.S., and T.R.] disliked Rohrer, they wanted him fired and they told J.C. that they wanted to see him fired); *Id*. at 2755 (told the administration during her interview that she had not seen anything inappropriate, that the allegations were a lie, and that the seniors wanted Rohrer

of the genuine issue of material fact. Likewise, Plaintiff challenges the credibility of Schakat as she alleges inconsistencies between Schakat's deposition and affidavit as to how the investigation was handled. It is not the task before this Court, however, to determine credibility.

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes [v. S. H. Kress & Co.]*, 398 U.S. [144] at 158-59, 90 S. Ct. 1598, 29 L. Ed. 2d 142 [(1970)].

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *see also Russo v. City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir. 1992).

The Motion for Summary Judgment on the First Cause of Action is DENIED .

## Second Cause of Action- 42 USC § 1983 against Defendant Moffitt

---

fired); (B.M. Aff., ECF No. 52, ¶¶ 4-5) (B.F., C.S., and T.R. were bullies. B.F. was rude and created drama, made up things); *Id.* at  ¶ 6) (B.F., C.S., and T.R. did not like Rohrer); (A.M. Aff., ECF No. 52-1, ¶ 6) (B.F., C.S., and T.R. did not like Rohrer, they were disrespectful and wanted to get him fired); *Id.* at ¶ 7 (B.F., C.S., and T.R. always tried to "stir up conflict" and create drama); (A.J. Aff., ECF No. 52-2, ¶ 4) (B.F., C.S., and T.R. did not like Rohrer and they acted rudely and disobediently toward him); *Id.* at  ¶ 5 (B.F., C.S., and T.R. created drama and "stirred up stuff); *Id.* at ¶ 6 (B.F., C.S., and T.R. started spreading rumors that Rohrer acted inappropriately with students and also inappropriately touched students); (B.V. Aff., ECF No. 52-3, ¶ 7) (B.F., C.S., and T.R. did not like Rohrer, they seemed to have a grudge against him); (M.H. Aff., ECF No. 52-4, ¶ 7) (B.F., C.S., and T.R. did not like Rohrer and it seemed like they were out to get him from the first day); *Id.* (heard some of the seniors say that they wanted to get Rohrer fired); *Id.* at  ¶ 8 (B.F., C.S., and T.R. caused a lot of drama and conflict in the culinary arts program, they started rumors about other students). T.R. himself admits that he was suspended four times during his two years at CTC on the basis of "frightening acts," fighting, profanity, obscenity, defiance, insubordination, disrespect, dress code violations, and disruption of class. (T.R. Depo., Doc. No. 60-6, PageID 2162-2168.)

Depositions and affidavits from authority figures at CTC, such as student intern Brooke Bishop Brennan and teachers McKee (formerly Whitacre) and Hay, likewise corroborate the former students' descriptions of B.F., C.S., and T.R. as being rude, having attitudes, and causing drama. (Hay Depo., ECF No. 60-3, PageID 1801-1804) (B.F. created a lot of drama, she would stir the pot, there were a lot of classroom issues those few years, much of which was B.F.'s doing); *Id.* at PageID 1809-1811 (C.S. was friends with B.F. and T.R., T.R. also helped create drama, however C.S. did not partake in it); (Brennan Aff., ECF No. 50-2, PageID 938, ¶ 7); (McKee Depo., ECF No. 64-4, PageID 2816-2817); (Hay Depo., ECF No. 60-3, PageID 1802-1804, 1809).

In her Second Cause of Action, Jane Doe pleads a 42 USC § 1983 claim against Defendant Moffitt. Specifically, she claims prior to her instance of abuse, Moffitt knew or should have known that Chef Rohrer exhibited dangerous propensities and was a threat to minor female students. (Complaint, ECF No. 1, PageID 8.) Further, Moffitt turned a blind eye to the previous allegations of sexual harassment, sexual grooming, sexual abuse, and misconduct. *Id*. This failure to respond demonstrated a deliberate indifference to the rights of minor female students. *Id*.

Defendants argue that this claim fails on the merits as Doe has failed to make a requisite showing that Rohrer showed a likelihood that he would attempt to sexually abuse students. (Motion for Summary Judgment, ECF No. 69, PageID 4653-4657.) Further, she has not demonstrated that Moffitt failed to take adequate precautions regarding Rohrer, the absence of which amounted to deliberate indifference. *Id*.

Plaintiff has since revised her § 1983 claim against Moffitt, stating that the portion relating to his "official capacity" should be dismissed as she asserted the same claim against the CTC Board. (Response to Motion for Summary Judgment, ECF No. 69, PageID 4653, fn. 15.) This portion of the claim is dismissed. The Court now turns to Doe's claim against Moffitt in his individual capacity.

As an initial matter, Plaintiff must show that: (1) she was deprived of a right secured by the Constitution; and that (2) such deprivation occurred under color of state law. A plaintiff can bring a claim under 42 U.S.C. § 1983 when she is deprived "of any rights, privileges, or immunities secured by the Constitution and laws," as a result of "any statute, ordinance, regulation, custom, or usage, of the State." 42 U.S.C. § 1983. "The right to be free from sexual abuse at the hands of a public school teacher is clearly protected by the Due Process Clause of

the Fourteenth Amendment." *Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 506 (6th Cir.

1996).

> Upon consideration, we hold that a schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee. The substantive component of the Due Process Clause protects students against abusive governmental power as exercised by a school. See *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996). To be sure, the magnitude of the liberty deprivation that sexual abuse inflicts upon the victim is an abuse of governmental power of the most fundamental sort; it is an unjustified intrusion that strips the very essence of personhood. If the "right to bodily integrity" means anything, it certainly encompasses the right not to be sexually assaulted under color of law. This conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause.
>
> ***
>
>  . . . We therefore hold that Doe had a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, that such right is fundamental, and that Davis's sexual abuse of Doe violated that right.

*Id*. at 506-507.

As stated above in the analysis of the First Cause of Action, the parties do not dispute

that Plaintiff was a victim of sexual battery by her teacher, Defendant Rohrer, and as a result

suffered a violation of her constitutional rights. The Court must then determine which state

actors can be held responsible for the constitutional injury caused directly by someone other than

those sought to be held accountable. The case falls under the Sixth Circuit's decision in *Doe v.*

*Claiborne County, Tennessee, supra*. As Doe is attempting to hold Moffitt, a school

administrator, individually liable for the constitutional injuries caused by Rohrer, the standards

of supervisory liability must be applied. *See Claiborne County,* 103 F.3d at 513; *Doe v. City of*

28

*Roseville Community Schools,* 296 F.3d 431, 439 (6th Cir. 2002).

> In *Hays v. Jefferson County*, 668 F.3d 869 (6th Cir. 1982), we held that the § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondent superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); *see also H.M. v. Bd. of Educ.*, 2015 U.S. Dist. LEXIS 101105, *12 (S.D. Ohio 2015); *Turner v. City of Taylor*, 412 F.3d 629, 643 (6th Cir. 2005); *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012); *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).

> It is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties. Rather, we said, "[a] plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students." *Claiborne County,* 103 F.3d at 513 (internal quotation marks omitted). Put another way, we said, the plaintiff must show that the "defendants' conduct amounted to a tacit authorization of the abuse." *Id.* (citing *Bellamy*, 729 F.2d at 421). We concluded that

>> Defendants here were simply not confronted with such a widespread pattern of constitutional violations that their actions amounted to a deliberate indifference to the danger of Davis sexually abusing students. The steps they did take, and even those they failed to take and arguably should have taken, do not show that they "encouraged the specific incident of misconduct or in some other way directly participated in it." Nor did they authorize, approve, or knowingly acquiesce in Davis's unconstitutional conduct. They had no knowledge, constructive or otherwise, that Davis was abusing

Doe.

*City of Roseville Community Schools,* 296 F.3d at 439.

The Sixth Circuit has also stated that liability must be based on "active unconstitutional behavior," and that the mere failure to act will not suffice. *Id*. at 440*, citing Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999). "In the absence of any allegation that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct, we held that the supervisors had, as a matter of law, 'neither committed a constitutional violation nor violated a clearly established right.'" *Id*., *quoting Shehee*, 199 F.3d at 300. The *Roseville* Court continued its analysis by referencing an Eleventh Circuit case that held "supervisor liability [under § 1983] occurs either when the supervisor personally participates . . . or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Id*., *quoting Braddy v. Florida Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). *Braddy* stated that "a causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated events." *Id*., *quoting Braddy, supra*. The Sixth Circuit concurred in this notion in *Claiborne County* when it applied the *Bellamy* and *Braddy* analysis to the facts before it and held that, "Defendants here were simply not confronted with such a widespread pattern of constitutional violations that their actions or inactions amounted to a deliberate indifference to the danger of Davis sexually abusing students." *Claiborne County*, 103 F.3d at 513.

The Court notes that Moffitt was no longer employed by CTC at the time Doe was abused by Rohrer. (Moffitt Depo., ECF No. 60-2, PageID 1657)(Resigned in February of 2012.)

Therefore this cause of action is dependent upon what information Moffitt possessed of the likelihood that Rohrer would attempt to sexually abuse students based on the 2011 investigation.

In viewing the evidence in the light most favorable to Plaintiff, Doe is not able to support a claim that Moffitt deprived her of her rights. She has not demonstrated that there is a genuine issue of material fact or that a reasonable finder of fact could find that Moffitt encouraged Rohrer's abuse of Doe or in some other way directly participated in it. Nor did he implicitly authorize, approve, or knowingly acquiesce in Rohrer's unconstitutional conduct.

Upon the initial complaints, the administration quickly initiated an internal investigation. (Schakat Depo., ECF. No. 41, PageID 494-495) (allegations were taken to Moffitt and they all conferred as a team as to how to investigate the allegations); (Moffitt Depo., ECF No. 60-2, PageID 1684) (left investigation in the hands of Schakat, Smith, and Jennings); (Rohrer Depo., ECF No. 60-5, PageID 1954) (investigation initiated against him as a result of allegations made by students). After the initial interviews and factfinding, the administration turned over the results of their investigation to Moffitt. He then reviewed all the materials and had an additional conversation with Chef Hay. (Moffitt Depo., ECF 60-2, PageID 1690.) At the conclusion of the investigation CTC determined that the allegations of inappropriate behavior were not credible.

Finding however, that Rohrer needed improvement on establishing professional boundaries, Moffitt gave him a verbal reprimand and created a professional development plan. (Moffitt Depo, ECF No. 60-2, PageID 1698-1699, 1704, 1713); (Rohrer Depo., ECF No. 60-5, PageID 1962, 1964-1966, 2015-2016). Further, the administration observed Rohrer's classes, labs, and the Jaguar Room to monitor the situation. (Moffitt, Depo., ECF No. 60-2, PageID 1705); (Schakat Aff., ECF No. 63-1, PageID 2460, ¶¶ 14, 18); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶¶ 3-5, 8.) This increased observation level continued through the 2011-2012

31

school year.

In addition the administrators engaged students in conversation to see how their year was going ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 15); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 6)), communicated with Chef Hay and Chef Rohrer on several occasions ((Moffitt Depo., ECF 60-2, PageID 1705) (personally checked in with Hay and Rohrer);(Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 16); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 7)), and spoke with the guidance counselor to monitor if there had been any new complaints of Rohrer's behavior. (Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 17.) At no time during the year were any additional concerns or allegations raised. ((Schakat Aff., ECF No. 63-1, PageID 2460, ¶ 21); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 10)).

Even accepting as true that the administration knew of the additional allegations B.F., C.S., and T.R. lodged against Rohrer, the incidents were isolated occurrences as opposed to "obvious, flagrant, and of continued duration" or of "such a widespread pattern of constitutional violations." *See City of Roseville*, 296 F.3d at 440-441, *quoting Braddy v. Florida Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) and *City of Claiborne County*, 103 F.3d at 513; *see also* (C.S. Depo., ECF No. 39, PageID 383)(aside from Rohrer touching students' backs and when he reached around B.F., not aware of other incidents when Rohrer had touched B.F.); *Id.* at PageID 401 (aside from B.F., did not see Rohrer touch any other student in a way that could be considered inappropriate); (B.F. Depo., ECF. No. 60-1, PageID 1554) (Rohrer never sexually propositioned her or touched her in a sexual way); *Id.* at PageID 1555 (not aware of any CTC student who had a sexual relationship with Rohrer); (T.R. Depo., ECF No. 60-6, PageID 2135) (aside from the "stirring the pot incident" T.R. did not witness any other inappropriate touching).

Moffitt's actions or inactions did not demonstrate deliberate indifference. Even  viewing the evidence in the  light most favorable to Plaintiff, Doe's contention that Defendants became lax in their supervision of Rohrer the following school year, she cannot meet her burden.  Doe has not shown that a reasonable jury could find that Moffitt encouraged, authorized, or acquiesced in  the incidents of misconduct or in some other way directly participated in it. Nor has she been able to establish a genuine issue of material fact as to an obvious, flagrant, ongoing, or widespread pattern of abuse that should have alerted Moffitt to the fact that Rohrer showed a strong likelihood that he would attempt to sexually abuse other students unless adequate precautions were taken. At most, Moffitt may have been sloppy or negligent in his supervision of Rohrer. The Sixth Circuit has held that negligence is not enough to impose § 1983 liability on a supervisor. *City of Roseville*, 296 F.3d at 441; *City of Claiborne County*, 103 F.3d at 513. Although there is a constitutional right to be free from sexual abuse at the hands of a school teacher or official, there is no constitutional right to be free from negligence in the supervision of the teacher or official who is actually responsible for the abuse. *City of Roseville*, 296 F.3d at 441.  The Motion for Summary Judgment  is GRANTED as to the Second Cause of Action.

### Third Cause of Action- 42 USC § 1983 Against Defendant CTC

In her Third Cause of Action, Jane Doe pleads  a 42 USC § 1983 claim against CTC. She alleges that CTC established, through both action and inaction, a widespread policy, practice, or custom of allowing sexual harassment, sexual grooming, sexual abuse, and misconduct to continue to occur without corrective action. (Complaint, ECF No. 1, PageID 10.) In support she

claims examples of failing to report teacher-on-student sexual harassment, sexual grooming, and sexual abuse to the appropriate authorities; a failure to cure or even attempt to cure obvious and known risks to minor females under Rohrer's supervision and authority; a failure to communicate any precautions, directives, or educational materials to parents and students about how to identify inappropriate conduct; by allowing Rohrer to have unsupervised contact with minor female students; and by allowing Rohrer to have unsupervised access to various rooms and areas at CTC. *Id*.

In their Motion for Summary Judgment, Defendants contend that Plaintiff's claim must fail as CTC did not have a custom of inaction. (Motion for Summary Judgment, ECF No. 69, PageID 4659.)

Institutional liability under 42 U.S.C. § 1983 and Title IX of the Civil Rights Act must be compared. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998); *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001). Under Title IX, a school would be liable for its own actions when it had actual notice of the violation and demonstrated deliberate indifference, whereas under § 1983 actions, a school board can be held liable if a teacher acted according to official policy. *Klemencic*, 263 F.3d at 510-511. A municipal liability claim against the county or school board must be examined by applying a two-pronged inquiry: (1) whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) whether the county and/or school board is responsible for that violation. *Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 505-506 (6th Cir. 1996), *citing Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *see also McCoy v. Board of Education*, 515 Fed. App'x 387, 392 (6th Cir. 2013).

Doe cannot base her claim against CTC solely on Rohrer's conduct, as *respondent superior* is not available as a theory of recovery under § 1983. Rather, she must show that the

schoolboard itself is the wrongdoer. *Burnell v. Williams*, 997 F. Supp. 886, 892 (N.D. Ohio 1998), *quoting Claiborne County, Tennessee,* 103 F.3d at 507 (*citing Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978)). A school board "cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district, leads to, causes, or results in the deprivation of a constitutionally protected right." *Claiborne County,* 103 F.3d at 507, *citing Monell*, 436 U.S. at 691; *McCoy*, 515 Fed. App'x at 393. To be considered a custom, the practice must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Claiborne County*, 103 F.3d at 507, *quoting Monell*, 436 U.S. at 691; *see also Burnell*, 997 F. Supp at 892.

In this case, as in similar cases, the claim is not that the Defendants had a custom affirmatively condoning sexual abuse of their students, but rather that the custom was Defendants' failure to act to prevent the sexual abuse.  To state a liability claim under a theory of "inaction" Doe must establish:

> (1) the existence of a clear and persistent pattern of sexual abuse by school employees;

> (2) notice or constructive notice on the part of the School Board;

> (3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

> (4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Claiborne County,* 103 F.3d at 508, *citing City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

This claim falters on the existence of a clear and persistent pattern of sexual abuse by school employees. Even assuming that the additional allegations were in fact raised by B.F.,

C.S., and T.R. to the administration, their complaints were isolated incidents as opposed to ongoing issues. (C.S. Depo., ECF No. 39, PageID 383)(aside from Rohrer touching students' backs and when he reached around B.F., not aware of other incidents when Rohrer had touched B.F.); *Id*. at PageID 401 (aside from B.F., did not see Rohrer touch any other student in a way that could be considered inappropriate); (B.F. Depo., ECF. No. 60-1, PageID 1554) (Rohrer never sexually propositioned her or touched her in a sexual way); *Id*. at  PageID 1555 (not aware of any CTC student that had a sexual relationship with Rohrer); (T.R. Depo., ECF No. 60-6, PageID  2135) (aside from the "stirring the pot incident" T.R. did not witness any other inappropriate touching).

Further, after establishing a professional growth plan and ongoing supervision, the administration was not made aware of continuing behavior or additional complaints until the incident with Doe. (Schakat Aff., ECF No. 63-1, PageID 2460, ¶¶ 17, 21); (Jennings Aff., ECF No. 64-6, PageID 2862, ¶ 10).   Doe cannot establish that there was a clear and persistent pattern of sexual abuse by school employees. Nor can she establish in the absence of that pattern, a custom of inaction on the part of the school board in either condoning or ignoring such issues of sexual harassment and abuse of its students by its employees.

As Plaintiff cannot meet these prongs, she fails to make an actionable claim under § 1983 as it relates to CTC and this Court does not need to continue its analysis. This cause of action is DISMISSED.

**Fourth Cause of Action- Intentional Infliction Of Emotional Distress Against All Defendants**

In her Fourth Cause of Action, Doe makes an intentional infliction of emotional distress claim against all Defendants. She argues that the emotional distress is a result of the actions of Defendants in continually and intentionally engaging in outrageous conduct. (Complaint, ECF No. 1, PageID 12.)  Doe alleges that she has suffered severe and permanent bodily injury, sickness and/or disease, including but not limited to:  sleep disturbance, nightmares, depression, posttraumatic stress disorder, fatigue, social anxiety, anger, and panic attacks. As a result she has and will continue to experience physical and mental pain and suffering, emotional distress, loss of a normal life, medical and counseling expenses, and lost wages. *Id.* at PageID 8 (¶ 44), 9 (¶ 53), 11 (¶ 64), 12 (¶ 69).

Defendants argue that the CTC Board, as a political subdivision, is immune from this state-law claim. (Motion for Summary Judgment, ECF No. 69, PageID 4664.)

Since the filing of her Complaint, Doe has dropped this cause of action against CTC based on political subdivision immunity. (Response, ECF No. 71, PageID 4713.) As such, this Court dismisses that portion of the claim.

On May 28, 2014, Plaintiff filed an Application to Clerk for Entry of Default Against Defendant Jeffrey Rohrer. (ECF No. 9.) The Clerk of Courts entered default on June 5, 2014, pursuant to Fed. R. Civ. P. 55(a) which states "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  (ECF No. 12.) Rohrer has not moved  to set aside the default judgment, nor attempted to show good cause as to why this would

be an appropriate action.

The Court turns to the cause of action against the remaining Defendant, Brad Moffitt. Defendants argue that Moffitt is immune. His actions were within the scope of his employment and pursuant to Ohio Revised Code § 2744.03(A)(6), he is afforded immunity as a political subdivision employee unless his acts or omissions were with malicious purpose, in bad faith, or made in a wanton or reckless manner. (Motion for Summary Judgment, ECF No. 69, PageID 4665.)

The doctrine of immunity under Ohio Revised Code § 2744.03(A)(6) states that an employee of a political subdivision is immune from liability unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. . . .

CTC is a political subdivision of the State of Ohio which operates a public vocational high school in Clark County, Ohio. (Complaint, ECF No. 1, PageID 2, ¶ 2.) Defendant Moffitt was the superintendent of CTC in 2011, at the time of the initial allegations against Rohrer. *Id*. at ¶ 3. As such he is granted immunity under § 2744.03(A) unless Plaintiff can make a showing that a reasonable factfinder could hold that one of the statutory exceptions applies. Neither party contests that Moffitt's actions were within the scope of his employment. Rather, Doe attempts to make the requisite showing under subsection b, that Moffitt's acts or omissions were wanton and reckless. (Response, ECF No. 71, PageID 4713.) In addition she argues that the conduct was outrageous. (Complaint, ECF No. 1, PageID 12, ¶¶ 68-69); (Response, ECF No. 71, PageID 4714.)

Wanton conduct has been defined as the failure to exercise any care toward those to whom a duty of care is owed in which there is a great possibility that harm will result. *H.M. v. Board of Education*, 2015 U.S. Dist. LEXIS 101105, 44 (S.D. Ohio 2015); *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388 (2012).  Ohio has adopted the definition of recklessness found in the Restatement of Law 2d, Torts (1965), § 501:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Marchetti v. Kalish*, 53 Ohio St. 3d 95, 96,  fn. 2 (1990) (citation omitted); *Taylor v. Mahoning County Children Servs. Board,* 2012 U.S. Dist. LEXIS 97371, 35-36 (N.D. Ohio 2012). The Supreme Court of Ohio has further differentiated recklessness and negligence in *O'Toole v. Denihan,* 2008-Ohio-2574, 118 Ohio St. 3d 374 (2008):

> Recklessness, therefore, necessarily requires something more than mere negligence. *Fabrey*, 70 Ohio St. 3d at 356, 639 N.E.2d 31. In fact, "the actor must be conscious that his conduct will in all probability result in injury." *Id*. Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity. *Id*.

*Taylor*, 2012 U.S. Dist. LEXIS 97371, *36, *quoting O'Toole, supra*. Recklessness is often used interchangeably with willful and wanton.  *Thompson v. McNeill*, 53 Ohio St. 3d 102, quoting 2 Restatement of Law 2d, Torts, § 500 (1965).  The term also means a perverse disregard of a known risk.  *Poe v. Hamilton*, 56 Ohio App. 3d 137 (1990).

Defendant Moffitt's actions were not  wanton or reckless. Rather than a failure to exercise any care toward the students, as soon as the 2011 allegations came to light, he  began an

internal investigation. Upon review of the evidence, including interviews from other students in the culinary arts program and interviews of the teachers, it was concluded that the claims were unfounded. (Moffitt Depo., ECF No. 60-2, PageID 1665, 1668, 1673-1676) (had conducted prior investigations into teacher misconduct including a previous claim of sexual misconduct); (Schakat Depo., ECF. No. 41, PageID 488) (met with the student(s) lodging complaints and/or a parent); (Smith Depo., ECF. No. 43, PageID 666) (met with CS and her mother regarding the allegations against Rohrer); (B.F. Depo., ECF. No. 60-1, PageID 1566-1570) (had numerous meetings with Schakat, Jennings, and Smith); (B.F. Depo., ECF. No. 60-1, PageID 1610) (meetings with Smith); (T.R. Depo., ECF No. 60-6, PageID 2139-2143, 2146) (brought his concerns about Rohrer to the administration, spoke with Schakat and Jennings); (Z.S. Depo., ECF No. 64-1, PageID 2684)(had discussion with Schakat regarding Rohrer); (J.C. Depo., ECF, No. 64-3, PageID 2755, 2760, 2780) (was interviewed by administration regarding Rohrer's behavior); (Schakat Depo., ECF. No. 41, PageID 494-495) (allegations were taken to Moffitt and they all conferred as a team as to how to investigate the allegations); (Moffitt Depo., ECF No. 60-2, PageID 1684) (left investigation in the hands of Schakat, Smith, and Jennings); (Rohrer Depo., ECF No. 60-5, PageID 1954) (investigation initiated against him as a result of allegations may be students); (Schakat Depo., ECF. No. 41, PageID 497) (interviewed students); (Jennings Depo., ECF. No. 42, PageID 599-600) (interview of students); (Smith Depo., ECF. No. 43, PageID 663, 665, 676) (supported Schakat in her role of investigating the allegations and the student interviews); (B.F. Depo., ECF. No. 60-1, PageID 1570-1571) (interviews with the culinary students); (Moffitt Depo., ECF No. 60-2, PageID 1685) (interview of culinary students and Chefs Rohrer and Hay); (Schakat Depo., ECF. No. 41, PageID 500) (interviewed teachers Rohrer and Hay); (Rohrer Depo., ECF No. 60-5, PageID 2025) (remembers at least one meeting

with Schakat and Smith); (Moffitt Depo., ECF No. 60-2, PageID 1689) (read report from Schakat and Jennings and then did some follow up interviews.)

Despite these findings, Moffitt met with Rohrer to give a verbal reprimand, discuss professional boundaries, and implement a personal growth plan. (Hay Depo., ECF No. 60-3, PageID 1813, 1816) (remembers a meeting with Moffitt, went as Rohrer's Union Representative); (Rohrer Depo., ECF No. 60-5, PageID 1961)(at conclusion of investigation had a meeting with Moffitt); (Moffitt Depo., ECF No. 60-2, PageID 1698, 1704-1705) (gave verbal reprimand to Rohrer and addressed professional behaviors and boundaries with the students, developed a professional growth plan); (Rohrer Depo., ECF No. 60-5, PageID 1962-1966) (in meeting with Moffitt, Moffitt talked about professional decorum and conduct, discussed having professional appearance and distance from students); (Schakat Depo., ECF. No. 41, PageID 512) (Moffitt met with Rohrer to implement a professional growth plan, Schakat helped monitor.) The administration observed Rohrer in the both the classroom/lab setting, as well as in the student run restaurant. (Moffitt Depo., ECF No. 60-2, PageID 1698, 1704-1705) (had directors monitor the situation, and personally checked in with Hay and Rohrer); (Rohrer Depo., ECF No. 60-5, PageID 2000-2001) (Schakat observed his classroom and lab, sometimes she came into the Jaguar Room to observe); (Jennings Depo., ECF. No. 42, PageID 609-610) (evaluated Rohrer's class as part of the professional growth plan); (Schakat Depo., ECF. No. 41, PageID 478-480)(observed Rohrer's class and lab); (Schakat Depo., ECF. No. 41, PageID 513) (monitored by being in the lab and classroom on multiple occasions); (Jennings Depo., ECF. No. 42, PageID 610) (observed Rohrer in the classroom on multiple occasions, both formal and informal evaluations.) Administrator Schakat performed the additional supervisory task of accompanying Rohrer and the culinary arts students on a field trip. The observations continued with Jennings

41

acting as Rohrer's supervisor throughout the following school year. (Jennings Depo., ECF No. 42, PageID 609); (Rohrer Depo., ECF No. 60-5, PageID 2034.)  At no time during the observation period did the administration find any inappropriate behavior.

In addition it is noted that in 2012 the staff was required to participate in online training covering the topic of Child Abuse Prevention. (Smith Aff., ECF No. 64-5, PageID ¶¶ 9-10) (CTC staff, including Schakat, Moffitt, Jennings, Smith, Rohrer, and Hay, were required and completed online training on Child Abuse Prevention in 2012.) Moffitt resigned from the position of superintendent in February of 2012, almost a year prior to Rohrer's sexual battery of Doe. (Moffitt, Depo., ECF No. 62-2, PageID 1657.)

In considering the evidence in a light most favorable to the Plaintiff and taking as true that additional allegations were raised by B.F., C.S., and T.R. as to Rohrer's conduct, that Moffitt's implementation of changes in the school policy deterred students from raising further allegations, and that he failed to enforce Rohrer's professional growth plan, Doe fails to establish a genuine issue of material fact or demonstrate that the Moffitt's actions/inaction were reckless. The additional allegations raised by the students' concerned inappropriate but isolated touching and inappropriate comments.  (C.S. Depo., ECF No. 39, PageID 383)(aside from Rohrer touching students' backs and when he reached around B.F., not aware of other incidents when Rohrer had touched B.F.); *Id.* at PageID 401 (aside from B.F., did not see Rohrer touch any other student in a way that could be considered inappropriate); (B.F. Depo., ECF. No. 60-1, PageID 1554) (Rohrer never sexually propositioned her or touched her in a sexual way); *Id.* at  PageID 1555 (not aware of any CTC student that had a sexual relationship with Rohrer); (T.R. Depo., ECF No. 60-6, PageID  2135) (aside from the "stirring the pot incident" T.R. did not witness any other inappropriate touching). While both the touching and comments would be cause for

concern, in light of the actions that were taken, Plaintiff cannot show that Moffitt disregarded the safety of the students, while knowing or having reason to know of facts which would lead a reasonable man to realize, that his conduct has created an unreasonable risk of physical harm to another. As for the changes in student policy, there is no evidence that the complaining students were even aware of Moffitt's new position that bringing false statements or harassing a teacher would result in punishment. If they were not aware of this change then they would not have been deterred from bringing forth any new legitimate concerns. (C.S. Depo., ECF No. 39, PageID 396-397); (B.F. Depo., ECF No. 60-1, PageID 1576).  Finally, evidence that Rohrer stopped covering his tattoos and began to grow his hair back out is not enough to support the proposition that Moffitt and the administration discontinued their efforts of supervising Rohrer.

Moffitt's role in the investigation and implemented remedies do not demonstrate a disposition to perversity nor that his conduct would in all probability have resulted in injury.  At most, Moffitt may have been negligent in his failure to supervise Rohrer more closely. Recklessness requires something more than mere negligence. *Taylor*, 2012 U.S. Dist. LEXIS 97371, *36; *O'Toole,* 2008-Ohio-2574, 118 Ohio St. 3d 374 (2008). Plaintiff does not make a threshold showing that a reasonable factfinder could find that the exception to immunity applies in this case.

Even if the exception were  to apply, Doe cannot make a requisite showing of a genuine issue of material fact as to Moffitt's conduct being "outrageous."  In recognizing the tort of intentional infliction of emotional distress, the Ohio Supreme Court adopted Restatement of the Law 2d, Torts 2d, § 46 (1965), and comment d to that section. As expounded upon by the Ohio Supreme Court:

> [W]e hold that in order to state a claim alleging the intentional
> infliction of emotional distress, the emotional distress alleged must

43

be serious.  As Dean Prosser reasoned in his learned treatise, "[i]t would be absurd for the law to seek to secure universal peace of mind, and many interferences with it must of necessity be left to other agencies of social control. 'Again a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be.' But this is a poor reason for denying recovery for any genuine, serious mental injury." Prosser, Law of Torts (4 ed. 1971) 51, Section 12 (quoting Magruder, Mental and Emotional Disturbance in the Law of Torts [1936], 49 Harv. L. Rev. 1033, 1035.)

\*\*\*

The standard we adopt in our recognition of the tort of intentional infliction of serious emotional distress is succinctly spelled out in the Restatement as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement of the Law 2d, Torts (1965) 71, Section 46(1).

\*\*\*

With respect to the requirement that the conduct alleged be "extreme and outrageous," we find comment d to Section 46 of the Restatement, *supra*, at 73, to be instructive in describing this standard.

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities.  The
rough edges of our society are still in need of a good deal of filing
down, and in the meantime plaintiffs must necessarily be expected
and required to be hardened to a certain amount of rough language,
and to occasional acts that are definitely inconsiderate and unkind.
There is no occasion for the law to intervene in every case where
someone's feelings are hurt. There must still be freedom to express
an unflattering opinion, and some safety valve must be left through
which irascible tempers may blow off relatively harmless steam.
See Magruder, Mental and Emotional Disturbance in the Law of
Torts, 49 Harvard Law Review 1033, 1053 (1936).

*Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 374-75 (1983), *abrogated by, Welling v. Weinfeld,*
113 Ohio St. 3d 464 (2007) [although *Yeager* has been abrogated by *Welling*, the proposition for
which the Court cites *Yeager* herein was not disturbed by *Welling*]; *see also Lombardo v.
Mahoney*, 2009-Ohio-5826, at ¶ 8, 2009 Ohio App. LEXIS 4901 (Ohio App. 8th Dist. 2009).

In order to recover on an action for the intentional infliction of serious emotional distress
four elements must be proved:  1) that the actor either intended to cause emotional distress or
knew or should have known that actions taken would result in serious emotional distress to the
plaintiff;  2) that the actor's conduct was so extreme and outrageous, that it went beyond all
possible bounds of decency and that it can be considered utterly intolerable in a civilized
community;  3) that the actor's actions were the proximate cause of the plaintiff's psychic injury;
and 4) that the mental anguish suffered by the plaintiff is serious and of a nature that no
reasonable person can be expected to endure it.  *Miller v. Currie*, 50 F.3d 373 (6th Cir. 1995);
*Pyle v. Pyle,* 11 Ohio App. 3d 31, 34 (Ohio App. 8th Dist. 1983) (citation omitted); *Bellios v.
Victor Balata Belting Co*., 724 F. Supp. 514, 520 (S.D. Ohio 1989); *see also Peterson v.
Northeastern Local Sch. Dist.*, 2014 U.S. Dist. LEXIS 68992, *40-41 (S.D. Ohio 2014), *citing
Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008).

Doe argues that Defendant Moffitt's handing of the 2011 internal investigation was

45

outrageous. (Response, ECF No. 71, PageID 4714.)  Specifically she states that there were "many blunders and failures" associated with the investigation and that Moffitt failed to enforce Rohrer's professional growth plan. *Id*.  Defendant Moffitt "undoubtedly knew their [CTC's] inactions were substantially likely to bring about injuries." *Id*.

As previously indicated, to establish the second element, "the alleged conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Colston v. Cleveland Pub. Library*, 2013 U.S. App. LEXIS 7690, *20 (6th Cir. 2013), *quoting Long v. Ford Motor Co.*, 193 F. App'x 497, 502-503 (6th Cir. 2006); *see also Curry*, *supra*.

The Sixth Circuit has recognized [in the propriety of applying this standard on summary judgment]:

> To the extent that [plaintiff] suggests a district court judge cannot rule that, as a matter of law, certain conduct does not rise (or sink) to the extreme and outrageous level required to state a claim for intentional infliction of emotional distress, she attempts to prove too much.  It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss.  *See, e.g., Rogers v. Targot Telemarketing Servs.*, 70 Ohio App. 3d 689, 591 N.E. 2d 1332, 1333, 1336 (1990)(treating plaintiff's allegations that she was falsely promised continued employment with the intention of causing her to detrimentally rely on the assurances as insufficient to qualify as extreme or outrageous); *Baab v. AMR Serv. Corp*., 811 F. Supp. 1246, 1270 (N.D. Ohio 1993)(stating that co-workers' display of photographs of scantily clad women and plaintiff's receipt of pornographic "sex toys" was not intolerable in a civilized society and therefore not extreme or outrageous).

*Miller v. Curie*, 50 F.3d 373, 377-78 (6th Cir. 1995).

For the reasons set forth above, Plaintiff has not shown  that Moffitt's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. Nor was the conduct regarded as atrocious and utterly intolerable in a civilized

community.   The Fourth Cause of Action is DISMISSED.

## Fifth Cause of Action- Civil Assault and Battery Against Defendant Rohrer

In her Fifth Cause of Action, Doe alleges Civil Assault and Battery against Defendant Rohrer, as without privilege to do so, Rohrer committed assault and battery upon Plaintiff. (Complaint, ECF No. 1, PageID 12.)  This cause of action is not before the Court on the instant Motion.

## Sixth Cause of Action- Wanton or Reckless Conduct Against Defendant Moffitt

Next, Plaintiff alleges that the above described conduct of Moffitt (Second Cause of Action) was wanton and reckless. As a direct and proximate result, Plaintiff has suffered damages. (Complaint, ECF No. 1, PageID 12.)

Defendants content that "Ohio law does not recognize a separate, distinct cause of action or theory of liability for "willful, wanton, and reckless misconduct." (Motion for Summary Judgment, ECF No. 69, PageID 4669.) Rather, "[w]illful, wanton, and reckless conduct 'is not a distinct cause of action but an element of various other causes of action . . .[and] is technically not a separate cause of action, but a level of intent which negates certain defenses which might be available in an ordinary negligence action.'" *Id.*, *quoting Bradley v. City of Cleveland*, 2012 U.S. Dist. LEXIS 30714, *9 (N.D. Ohio 2012)(*quoting Griggy v. Cuyahoga Falls*, Summit App. No. 22743, 2006-Ohio-252, ¶ 8.)

Wanton and reckless conduct does not stand alone as a distinct separate cause of action in

Ohio, but rather it is an element of other causes of actions or may create an exception to immunity, as previously argued by Plaintiff in her Second Cause of Action. As such, this cause of action is DISMISSED  for failure to state a claim. *Bickerstaff v. Lucarelli*, 2015 U.S. Dist. LEXIS 43603, *12 (N.D. Ohio 2015); *Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 643 (N.D. Ohio 2014); *Cincinnati Ins. Co. v. Oancea*, 2004-Ohio-4272, ¶ 17 (6th  App. Dist. 2004); *Bradley*, 2012 U.S. Dist. LEXIS 30714, *9 (*quoting Griggy v. Cuyahoga Falls*, Summit App. No. 22743, 2006-Ohio-252, ¶ 8)

**Conclusion**

For the reasons set forth above the Motion for Summary Judgment is DENIED as to the First Cause of Action and GRANTED as to the Second, Third, Fourth, and Sixth Causes of Action.

September 30, 2015.

s/ *Michael R. Merz*
United States Magistrate Judge